FILED & JUDGMENT ENTERED
Steven T. Salata

April 11 2019

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
Laura T. Beyer
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

In re:

VR KING CONSTRUCTION, LLC,[1]

                  Debtor.

Case No.:    18-31635

Chapter 11

**ORDER GRANTING MOTIONS TO CONVERT CASE TO CHAPTER 7 AND DENYING MOTION FOR ORDER REQUIRING TURNOVER, ESCROW OR PROHIBITING USE OF INSURANCE PROCEEDS COVERAGE**

THIS MATTER came before the Court on the Motion to Convert Consolidated Debtors to Chapter 7; Motion for Order Requiring Turnover, Escrow or Prohibiting Use of Insurance Proceeds Coverage [Doc. No. 38] filed by Y2 Yoga Cotswold, LLC ("Y2") and the Motion of the Bankruptcy Administrator to Convert the Debtor's Case to a Chapter 7 Case, Pursuant to 11 U.S.C. § 1112(b) [Doc. No. 59] (collectively, the "Motions"). Notice of the Motions was adequate under the circumstances and no further or additional notice of the Motions is required or necessary. The Court held a hearing on the Motions on March 27, 2019 and April 1, 2019. The Bankruptcy Administrator and attorneys representing Y2 and the Debtor appeared at the hearing.

Based on the matters of record, the testimony and evidence presented, and judicial notice taken of adjudicative facts, the Court makes the following:

**FINDINGS OF FACT**

1. The Debtors filed these Chapter 11 cases on October 31, 2018.

2. Vinroy Reid ("Reid") is the sole owner of VR King Construction, LLC ("VR King"), Baranko Enterprises, Inc. ("Baranko"), and VR Investments, LLC ("VR Investments") (collectively, the "Debtor" or "Debtors").

---

[1] This case has been substantively consolidated with the following Chapter 11 debtors: VR Investments, LLC 18-31637 and Baranko Enterprises, Inc. 18-31638.

3.  The Debtors were substantively consolidated by order entered on December 13, 2018 [Doc. No. 21], and VR King is the substantively consolidated Debtor.

4.  Reid commenced a Chapter 13 bankruptcy proceeding on September 21, 2018 that is pending in this Court as Case Number 18-31436 (the "Reid Bankruptcy").

**A.  Findings with respect to 11 U.S.C. § 1112(b)(4)(A) & (B)**

5.  Although he has been in a Chapter 13 proceeding for more than six months, Reid testified that he did not maintain a personal bank account until recently. Virtually all of Reid's personal expenses appear to have been paid through the Debtor's bank accounts with no regard to corporate formalities, resulting in a loss to or diminution of the estates.

6.  Reid, through the Debtor, spent significant funds belonging to the Debtor to pay Reid's personal expenses, expenses not in the ordinary course of business, pre-petition debt, and to upfit a yet-to-be-opened restaurant owned by Mama's Caribbean Grill, LLC ("Mama's Atlanta") in Decatur, Georgia. Reid testified that most of the payments to his ex-wife and children were for "paperwork"; the Court does not find this testimony to be credible because the evidence shows that the Debtor fails to maintain business records. Reid and the Debtor used corporate funds to pay expenses that are not in the ordinary course of business, including approximately $1,500.00 to attorney Verna Bash Flowers, Esq. for Reid's personal bankruptcy case.

7.  Reid does not dispute that many of the payments made by the Debtor were for his personal benefit. As shown by the testimony and Reid's handwritten annotations on the Debtor's bank statements, numerous expenses paid by the Debtor were personal in nature.

8.  Reid and the Debtor fail to observe appropriate distinctions between Reid's personal finances and the Debtor's corporate finances. Reid and the Debtor do not keep appropriate records.

9.  Reid acknowledged withdrawing and pocketing some of the cash from the Debtor's bank accounts, as well as giving cash to employees, some of whom are family members and others for whom there is no documentation of the work that has been done to earn such payments.

10.  Reid gave troublesome testimony that he, or one of the Debtors, was holding approximately $30,000.00 to $40,000.00 in cash, in a safe, at the time the bankruptcy petition was filed. Reid and the Debtors did not disclose this cash in their respective schedules. In light of this failure, the Court is concerned that there may be other assets which are hidden or not disclosed.

11.  David Guidry, Esq. ("Guidry") testified on March 27, 2019 that i) he represented Y2 in connection with litigation in state court against Reid and the Debtors; ii) Y2 paid VR King the contract price of approximately $1,400,000.00, the work was unfinished, and VR King quit performing under the contract; iii) Y2 conducted discovery concerning the Debtors' use of Y2's funds, cash transactions, and transfers between related entities; iv) the Debtors had no reliable business records and it could not be determined how Y2's funds were used; v) Reid and/or the Debtors acquired various parcels of real property for cash during the time they were receiving payments from Y2 pursuant to the construction contract; and vi) during the time of the Y2 project, Reid generally used funds to fix up real property owned by the Debtors; pay property insurance; pay mortgages; fund other renovation projects; and operate the Mama's Caribbean restaurant in Charlotte.

12. On November 14, 2018, the Debtors filed a joint motion to consolidate the three Chapter 11 cases [Doc. No. 12]. The motion to consolidate states in part that consolidation was warranted because "VR, King and Baranko have no clear division between each other, have identical creditors, used one bank account and failed to have corporate meetings," "the lack of the Debtors' books and records pre-petition," and the Debtors' "failure to distinguish their assets and otherwise failing to respect corporate formalities in their daily operations."

13. Debtor's counsel questioned Reid concerning alleged renovations to the Debtor's rental properties and argued that new tenants could be found and that a plan of reorganization could be filed by the current deadline. The Court finds that Reid's testimony was convenient and hopeful. There was little testimony concerning the actual basis for a plan of reorganization for the Debtor and no evidence to support Reid's testimony and counsel's representations concerning the status of renovations, the existence of tenants, the prospects for new tenants, or what realistic rent could be charged if the properties were fully renovated and leased.

14. Mama's Atlanta is owned jointly by Reid and his mother Hazelyn Mills. Reid's ownership of Mama's Atlanta, which was formed in the summer of 2018, was not disclosed in the Reid Bankruptcy.

15. Reid testified that VR King and Mama's Atlanta have an oral contract for a restaurant upfit and that Reid and/or VR King were paid some amount of cash in advance for the upfit work. Reid also testified that Mama's Atlanta has made no payments for the upfit work since the Chapter 11 filings, that there is no written contract, and that Mama's Atlanta is being charged for actual expenses but not for any overhead or profit. There is no evidence of what, if anything, would be earned by the Debtor on the Atlanta project.

16. It is not clear that the contract between VR King and Mama's Atlanta is of any benefit to the Debtor. The work being done by VR King is gratuitous. It also represents a conflict of interests by Reid and a breach of Reid's fiduciary duty to the Debtor's estate, as the Debtor could otherwise be completing projects that would benefit the Debtor's estate, such as renovating the properties in Charlotte.

17. In addition to the construction work in Georgia, Reid also testified that VR King is engaged in construction work in New York and that it is not necessary for VR King to have a general contractor's license in those states. While making no finding with respect to whether VR King is required to have such a license in either state, the Court believes it is unlikely that those licenses are not required. As with the project in Georgia, the Debtor has no written contract for the project in New York and provided no evidence from which the Court could determine the value or benefit of the contract to the estate.

18. Reid testified that the schedules filed by the Debtors do not accurately reflect the fair market values of the Debtors' assets.

19. Reid testified that John Woodman, Esq. ("Woodman"), counsel for the Debtors, and R. Keith Johnson, Esq. ("Johnson"), counsel for Reid, were responsible for inaccuracies in the schedules, statements, and reports that have been filed with the Court. Reid testified that for the most part he had not seen or he had not actually signed many of the documents that had been filed with the Court.

20. The Court received extensive testimony from Woodman and Johnson, and the Court reviewed multiple exhibits concerning their preparation of the documents and Reid's review of those documents before those documents were filed with the Court.

21.     Johnson testified that he sat down with Reid and reviewed every question in the schedules and statements and that he did significant additional research concerning the property owned by Reid, Reid's transfer of certain properties to the Debtors, the value of such properties, and the debts secured by such properties. In anticipation that the schedules and statements would be analogous between the Chapter 13 case and the Debtors' cases, Woodman was present during these meetings and completed research with Johnson. Johnson prepared the schedules, statements, and amendments thereto based on information provided by Reid. Reid was asked to review the documents, and, after Reid advised Johnson that the documents were "OK" to be filed, Johnson filed the documents.

22.     Woodman testified that much of the information in the Debtors' respective schedules came from the public record, Reid's tax returns, the schedule and statements from the Chapter 13 case regarding which Woodman conferred with Reid and Johnson, and discovery completed in the state court litigation with Y2 that was furnished by Reid's and the Debtors' state court counsel. Woodman reasonably presumed that the information furnished from the Y2 litigation was reviewed by counsel with Reid. Woodman's paralegal reviewed the monthly reports with Reid, and Reid executed and approved those reports before they were filed with the Court. Reid cannot absolve himself of responsibility for the accuracy of the schedules when he was the source of the information, he had the opportunity to review the documents before they were filed with the Court, and he approved the filing of the documents with the Court.

23.     While Woodman and Johnson do not appear to have complied in all respects with the Local Rules concerning the filing of schedules, statements, and amendments, such as retaining "wet signatures" of Reid on the declarations for those documents, the evidence demonstrates that Johnson and Woodman sought and received authority from Reid to file each document. The Court finds that Reid's testimony concerning the alleged responsibility of Johnson and Woodman for the inaccuracy of the schedules, statements, reports, and amendments thereto is neither accurate nor credible. Such testimony was merely an effort to shift the blame to third parties.

24.     Debtor's counsel argued to the Court that, with the employment of an accountant for the Debtor, everything will change and that the Debtor will stay in compliance with the Bankruptcy Code and the Operating Orders. However, in light of the Guidry testimony concerning the Debtors' pre-petition business practices and the testimony regarding the way in which the consolidated Debtor has run its business on a post-petition basis, the Court finds this difficult to believe.

25.     Debtor's counsel also argued that, had the Bankruptcy Administrator filed a motion to convert earlier, the Debtor would have been able to "get on track" earlier. It is absurd for the Debtor to blame the Bankruptcy Administrator for the problems caused by Reid and the Debtor in this case.

26.     Debtor's counsel filed an application to be employed by the Debtor on March 2, 2019, nearly a month prior to the hearing on these Motions. During that time, no amended schedules or statements of financial affairs have been filed with the Court. The January and February 2019 monthly status reports remain unfiled. No plan has been filed although the Debtor's case has been pending in excess of five months. These documents should have been filed, and the fact that they have not been filed does not give the Court much hope that the Debtor has the ability to reorganize or that anything will change in the near future. It defies reality for the Debtor to suggest that it can "flip a switch" and change the direction of this case.

### B.     Findings with respect to 11 U.S.C. § 1112(b)(4)(E)

27.     The compensation paid by the Debtor to Reid post-petition appears to be in contravention of Paragraph G of this Court's November 1, 2018 Operating Orders (the "Operating Orders").

4

28. The Debtor has paid various individuals, including Reid, as "independent contractors" and has not paid withholding taxes, Medicare, or Social Security. The Court reaches no conclusion regarding this practice but suspects, based on Reid's testimony, that it may have been appropriate to consider such payments to be payroll and to establish separate tax accounts as required by Paragraphs D(1) and D(3)(a) of the Operating Orders.

29. Reid, through the Debtor, has spent significant funds of the Debtor to pay Reid's personal expenses, and Reid has disposed of estate property as he sees fit and without prior order of this Court, contrary to Paragraph F of the Operating Orders. Payment of Reid's personal expenses are of no benefit to the Debtor's estate or creditors.

30. The Debtor has not timely filed monthly reports, some of which remain unfiled, in contravention of Paragraph H of the Operating Orders. In addition, Reid testified that the monthly reports that have been filed are inaccurate.

31. The Debtor failed to timely pay its quarterly fees as required by Paragraph I of the Operating Orders.

## C. **Findings with respect to Y2's Motion for Order Requiring Turnover, Escrow or Prohibiting Use of Insurance Proceeds Coverage**

32. The evidence presented was insufficient to grant the relief requested.

33. The Chapter 7 Trustee is requested to investigate and determine the interests of the Debtor and Y2 in the proceeds of any insurance policies and to handle such as is appropriate.

Based on the foregoing Findings of Fact, the Court makes the following

## CONCLUSIONS OF LAW

A. The conversion of this case to Chapter 7 is in the best interest of creditors and the estate of the consolidated Debtor;

B. Cause exists to convert this case to Chapter 7 pursuant to 11 U.S.C. § 1112(b)(4)(A), (B), and (E);

C. A. Burton Shuford is appointed Chapter 7 Trustee for the consolidated Debtor;

D. Y2's Motion for Order Requiring Turnover, Escrow or Prohibiting Use of Insurance Proceeds Coverage is denied without prejudice; and

E. The undersigned shall continue to be assigned as Judge for the above-captioned case after its conversion to Chapter 7.

*This Order has been signed electronically.*  
*The Judge's signature and Court's seal*  
*appear at the top of this Order.*

*United States Bankruptcy Court*